UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Geralyn M. Minke,  
      Plaintiff,

v.

Michael J. Astrue,  
Commissioner of Social Security,  
      Defendant.

Civil No. 09-3494 (PAM/JJG)

REPORT AND RECOMMENDATION

---

JEANNE J. GRAHAM, United States Magistrate Judge

Plaintiff Geralyn M. Minke seeks judicial review of the Defendant Commissioner of Social Security's denial of her application for disability insurance benefits. The case was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and is presently before the Court on cross-motions for summary judgment. For the reasons stated below, the Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

## I. BACKGROUND

Plaintiff filed her application for disability insurance benefits on March 1, 2006, claiming to be disabled from a temporomandibular joint (TMJ) disorder, pain, fatigue, hearing loss, neck muscle problems, whiplash, neck pain, headaches, dizziness, blurred vision, anxiety, and depression. (Admin. R. at 8, 123.) Plaintiff's alleged onset of disability date was September 11, 2004, and her date last insured was June 30, 2005. (*Id.* at 8.)

### A. Medical Evidence of Record

The most relevant medical records are contemporaneous to the period of time between

Plaintiff's onset of disability date and the date she was last insured. Therefore, the Court will focus on the records between September 11, 2004 and June 30, 2005, but will also consider other records to the extent they relate to or describe Plaintiff's condition during the relevant time period.

Plaintiff was involved in motor vehicle accidents in 1997 and 1999, sustaining whiplash injuries both times. (Admin. R. at 232.) Her treating doctors imposed work restrictions immediately following the accidents, but described her as only "temporarily totally disabled." (*Id.* at 320-21.)

### 1. Dr. Rosemarie Delorey

At an annual examination on January 14, 2004, Plaintiff told Dr. Rosemarie Delorey that she was experiencing fatigue, sleeping problems, muscle aches, and pain. (*Id.* at 269.) Dr. Delorey diagnosed Plaintiff with fatigue, depression, and fibromyalgia, but described Plaintiff as alert, appropriate, and cheerful. (*Id.*) Dr. Delorey's recommended course of treatment was to increase Plaintiff's Prozac dosage and add Elavil to her nightly medication regimen. (*Id.*) Dr. Delorey did not impose any work or other restrictions, nor did she refer Plaintiff to a therapist, psychologist, rheumatologist, or other medical provider for treatment of depression or fibromyalgia.

Dr. Delorey referred Plaintiff to Dr. Joseph Campanelli for an assessment of her hearing loss in 2005. (*Id.* at 250.) Diagnostic testing indicated hearing thresholds between 55 and 75 decibels and a speech discrimination score of 96 percent in both ears. (*Id.* at 255.) Dr. Campanelli referred Plaintiff for a hearing aid evaluation and told her to return in three years unless she developed new symptoms. (*Id.* at 250-51.) There are no other records from Dr. Campanelli.

Following an annual examination on February 23, 2005, Dr. Delorey wrote that Plaintiff had a history of depression, anxiety, chronic fatigue, and cervical dysplasia. (*Id.* at 262.) At that time, Plaintiff's prescribed medications were BuSpar, Prozac, and Zyrtec. (*Id.*) Plaintiff told Dr. Delorey that she was seeing an oral surgeon for treatment of a malocclusion, TMJ, and osteoarthritis, and that she was "quite pleased" with the results. (*Id.*) When Plaintiff said she intended to ask the oral surgeon to impose work restrictions, Dr. Delorey said it was not her understanding that TMJ could cause long-term disability. (*Id.*)

Dr. Delorey further remarked that Plaintiff was student teaching, but that a recent ankle strain was affecting her ability to stand for long periods of time. (*Id.*) At Plaintiff's request, Dr. Delorey recommended that Plaintiff be restricted from standing more than four to six hours at a time for six weeks. (*Id.*) Dr. Delorey noted that Plaintiff's "plate [was] pretty full" with student teaching and a "busy family life." (*Id.*)

Plaintiff attended another routine physical examination with Dr. Delorey on November 17, 2005, because she had changed insurance companies. (*Id.* at 260.) Dr. Delorey noted that Plaintiff had just finished college, felt pleased with that accomplishment, and loved student teaching. (*Id.*) Plaintiff attributed her fatigue and other health concerns to anxiety. (*Id.*)

Following an appointment on March 16, 2006, Dr. Delorey noted marked changes in Plaintiff's condition. (*Id.* at 258.) Dr. Delorey commented that Plaintiff was unable to work for more than four or five hours due to pain and had to lie down if she worked longer than that. (*Id.*) Dr. Delorey noted that Plaintiff had a component of fibromyalgia and thought she might be depressed, given her fatigue and desire to stay in bed. (*Id.*) On June 28, 2006, Dr. Delorey wrote that she had treated Plaintiff for many years for recurrent TMJ and neck pain. (*Id.* at 353.) She wrote that Plaintiff also suffered from fibromyalgia, headaches, migraines, myofascial pain

3

syndrome, chronic fatigue, anxiety, and depression. (*Id.*) According to Dr. Delorey, these conditions caused hearing loss, sleep disturbance, muscle spasms, and chronic nerve damage. (*Id.*)

Dr. Delorey completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) form on November 17, 2006. (*Id.* at 378-81.) She indicated that Plaintiff's "myofascial syndrome" limited her to carrying ten pounds occasionally and five pounds frequently, and standing or walking no more than a total of twenty minutes in an eight-hour workday. (*Id.* at 378-79.) She also opined that Plaintiff could not sit or hold up her head. (*Id.* at 379.) Dr. Delorey wrote that Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl, due to significant myofascial pain and dizziness. (*Id.* at 380.)

Dr. Delorey completed a similar assessment form with respect to Plaintiff's mental abilities. (*Id.* at 382-84.) She indicated that chronic pain significantly impaired Plaintiff's abilities to deal with work stresses, maintain attention and concentration, understand and carry out complex and detailed job instructions, and be reliable. (*Id.* at 383-84.)

### 2. Dr. Kevin Peterson

Plaintiff sprained her ankle on January 30, 2005. (*Id.* at 264.) She was instructed to wear a cast-walking boot for several weeks and to use acetaminophen for pain. (*Id.*) Dr. Kevin Peterson indicated that Plaintiff should restrict student teaching to four hours a day for four days, and then return to full days. (*Id.*)

### 3. Dr. Terrance J. Spahl

Plaintiff began treating with Dr. Terrance J. Spahl, D.D.S. in September 2004. (*Id.* at 365.) She complained of frequent headaches, fatigue, poor hearing, and constant pain in her jaw, which affected her concentration and vision. (*Id.* at 370, 372.) Dr. Spahl diagnosed Plaintiff with

TMJ osteoarthritis and fitted her with a retainer. (*Id.* at 365, 370.)

On January 10, 2005, Plaintiff told Dr. Spahl she was "[d]oing pretty good" and described her headache pain as a two on a ten-point scale. (*Id.* at 365.) By July 2005, Plaintiff's headaches were gone, but her jaw muscles were sore. (*Id.* at 366.) In November 2005, Plaintiff said she was 80 percent better, although in December 2005, she said her right side hurt constantly. (*Id.*) By February 2006, Plaintiff's condition had drastically deteriorated. She reported pain on both sides, difficulty swallowing and holding up her head, and neck pain. (*Id.*)

Dr. Spahl wrote a letter on June 8, 2006, describing Plaintiff's TMJ disorder as advanced and her head, jaw, neck, and facial pain as chronic. (*Id.* at 353.) Dr. Spahl remarked that Plaintiff's TMJ syndrome caused chronic compression nerve damage, significant decreases in her already-limited hearing, and great difficulty in talking or chewing for extended periods of time. (*Id.*) Dr. Spahl noted that Plaintiff's TMJ condition was very exhausting at times, necessitating extended periods of compensatory sleep. (*Id.*) He described her as experiencing daily jaw pain, which caused dizziness, headaches, and an inability to hold her head up for extended periods of time. (*Id.*) Although Dr. Spahl wrote that advanced TMJ disease drove some patients to suicide, he noted no suicidal tendencies in Plaintiff. (*Id.*)

### 4. Dr. John Dixon

On March 8, 2005, chiropractor John Dixon opined that Plaintiff could work forty hours a week, as long as she was restricted from ladder-climbing and strenuous pushing or pulling for two weeks. (*Id.* at 330.) Dr. Dixon noted on June 20, 2005, that Plaintiff had experienced an acute onset of neck and jaw pain on June 4, 2005, but by August 8, 2005, he remarked that Plaintiff was doing reasonably well and had obtained significant relief with treatment. (*Id.* at 327-329.)

On April 29, 2006, Dr. John Dixon wrote a letter on Plaintiff's behalf, noting that Plaintiff's spine, cervical, and thoracic injuries were consistent with her complaints of head, neck, shoulder, jaw, and lower back pain. (*Id.* at 319.) He wrote that her condition was permanent and any further treatment would be palliative in nature. (*Id.*)

### 5. Physicians Neck and Back Clinic

Plaintiff began attending the Physicians Neck and Back Clinic (PNBC) on January 10, 2006, for relief of neck, arm, upper back, shoulder, and head pain. (*Id.* at 232.) She described her present pain as a five on a ten-point scale and said her pain intensified at night or with increased activity. (*Id.*) After examining Plaintiff, Dr. Brian Nelson concluded that Plaintiff had a mild deconditioning syndrome, although diagnostic testing revealed she was quite strong. (*Id.*) He recommended a short-term rehabilitation program two times a week to restore her to optimal functioning. (*Id.*) During Plaintiff's six weeks of rehabilitation at PNBC, she often reported feeling improvement, but other times she felt fatigued, discouraged, apathetic, or in pain. (*Id.* at 239-40.) After Plaintiff's final appointment on February 21, 2006, Dr. Nelson described her subjective neck pain as slightly worse, her headache pain as slightly worse, and her arm and interscapular pain as unchanged. (*Id.* at 229-30.) Because Plaintiff had responded so poorly to rehabilitation, Dr. Nelson recommended that she discontinue treatment (*Id.* at 229.)

### 6. Dr. Gerald Hejny

Chiropractor Gerald Hejny wrote in a letter on June 19, 2006 that he had treated Plaintiff since October 11, 2005, with a conservative course of treatment aimed at obtaining palliative relief. (*Id.* at 354.) He opined that Plaintiff had a permanent partial impairment of her cervical, thoracic, and lumbrosacral regions of her spine, and that Plaintiff would never be capable of gainful employment. (*Id.*)

### 7. Dr. William Paule

Dr. William Paule assessed Plaintiff's medical records and completed a Physical RFC Assessment form on May 22, 2006. (*Id.* at 352.) He found Plaintiff's complaints of severe fatigue inconsistent with her educational activities, marriage, and recent adoption of a child. (*Id.* at 346.) Despite Plaintiff's many complaints of neck pain during the relevant time period, Dr. Paule found it significant that no physician had ever ordered or performed a radiologic study of her neck. (*Id.*) Dr. Paule also observed that no physician had imposed permanent exertional, postural, manipulative, or visual limitations. (*Id.* at 346, 347, 348.) Dr. Paule acknowledged Plaintiff's mild to moderate hearing loss and noted she was referred for a hearing aid evaluation. (*Id.* at 349.) Given Plaintiff's hearing loss, Dr. Paule recommended she avoid moderate exposure to noise. (*Id.* at 349.)

### B. Subjective Evidence

Plaintiff completed a Patient Health Questionnaire on August 17, 2005, stating that she experienced constant shoulder pain and intermittent headaches, jaw pain, and neck pain. (Admin. R. at 334.) She described the pain as so intense that she was preoccupied with seeking relief. (*Id.*)

Plaintiff's spouse, Paul Pampuch, completed a Third Party Function Report in March 2006. He wrote that, on a daily basis, Plaintiff sat at the computer, did some housework, napped, fixed dinner, and watched television in bed. (*Id.* at 149.) Pampuch remarked that Plaintiff cared for him and their children, including cooking, doing laundry, and helping with homework. (*Id.* at 150.) According to Pampuch, Plaintiff slept twelve or more hours a day and did not have a normal sleep pattern. (*Id.*)

Plaintiff also completed a Function Report, describing her daily activities as eating,

napping, showering, reading the newspaper, watching television, helping her children with their homework, and possibly vacuuming or doing laundry. (*Id.* at 157.) She claimed she experienced jaw and full-body pain daily, and that pain and muscle spasms interrupted her sleep. (*Id*. at 157, 158.) She said she was constantly fatigued and could not function for more than four hours without lying down to rest. (*Id.* at 164.)

In 2006, Plaintiff earned a master's degree in Elementary Education. (*Id.* at 180, 270.) After one day of teaching, she had to recuperate in bed for three days. (*Id.*)

C. **Administrative Proceedings**

After Plaintiff's application for benefits was denied initially and on reconsideration, an administrative hearing before an Administrative Law Judge (ALJ) was scheduled at her request. At that hearing on November 12, 2008, Plaintiff testified that when she first saw Dr. Spahl, she was sleeping twenty to twenty-two hours a day. (Admin. R. at 22.) She testified that daily migraines frequently precluded her from doing anything but eating and sleeping. (*Id.* at 23.) She claimed to suffer from constant jaw pain, which when combined with headaches and fatigue, exacerbated her inability to hear and understand people. (*Id.* at 26-27.) Plaintiff further testified that she had attempted to work full-time as a teacher in August 2008, but quit before she was fired. (*Id.* at 29.) The work exhausted her, and she had been accused of getting angry at the students and not listening. (*Id.* at 30.)

Vocational expert Norman Mastbaum also testified at the hearing. He was asked to consider a person of Plaintiff's age, education, and work experience; who suffered from TMJ syndrome, myofascial pain syndrome, hearing loss, dizziness, blurred vision, fatigue, and fibromyalgia; who was limited to unskilled work due to chronic pain; and who could speak only occasionally but could not tolerate even a moderate noise level. (*Id.* at 34-37.) Mastbaum

testified that such a person could work as a surveillance system monitor, parking lot cashier, and checker. (*Id.* at 37-38.)

The ALJ issued his decision on January 23, 2009, finding that Plaintiff was not disabled. (*Id.* at 5.) As required by 20 C.F.R. § 404.1520(a)(4), he first determined that Plaintiff had not engaged in substantial gainful activity between her alleged onset date and the date she was last insured. (Admin. R. at 10.) During this period, the ALJ found, Plaintiff suffered from the severe impairments of TMJ syndrome, myofascial pain syndrome, and hearing loss. (*Id.*) Plaintiff's dizziness, blurred vision, fatigue, fibromyalgia, anxiety, and depression were found not to be severe during the relevant time period. (*Id.* at 10-11.) In assessing Plaintiff's impairments, the ALJ gave little weight to evidence dated after Plaintiff was last insured. (*Id.* at 12.)

The ALJ found that Plaintiff's hearing loss was mitigated by the use of a hearing aid, and he noted no functional limitations due to hearing loss. (*Id.*) In addition, Plaintiff displayed little difficulty hearing and communicating at the administrative hearing. (*Id.*) The ALJ specifically discussed medical evidence from Dr. Spahl and Dr. Delorey, but discounted treatment notes dated after June 30, 2005 and those of a generalized or speculative nature. (*Id.*) The ALJ also noted that Plaintiff had significant accomplishments during the relevant time period such as earning a master's degree and completing a student teaching requirement. (*Id.*) He discredited the severity of Plaintiff's subjective complaints as inconsistent with the medical evidence, her daily activities, and functional limitations. (*Id.* at 13-14.)

Next, the ALJ determined that Plaintiff could not perform her past relevant work in skilled or semi-skilled positions. (*Id.* at 14.) He found, however, that Plaintiff had the residual functional capacity (RFC) to perform a full range of unskilled work at all levels of exertion, as long as she was not exposed to constant and concentrated noise and could limit her speech. (*Id.*

9

at 11.) The ALJ then considered Plaintiff's RFC, age, education, work experience, and to limited extent her subjective complaints, in concluding that Plaintiff could have performed a significant number of jobs in the national economy during the relevant time period. (*Id.*) Accordingly, Plaintiff was deemed not disabled between September 11, 2004 and June 30, 2005.

Plaintiff sought review of the ALJ's decision from the Appeals Council, which denied the request. (*Id*. at 1.) The ALJ's decision therefore became the final decision of the Commissioner.

## II.     STANDARD OF REVIEW

An individual must be disabled in order to receive Social Security disability benefits. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). "Disability is defined as the inability 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting 42 U.S.C. § 1382c(a)(3)(A)). To determine whether a claimant is disabled, "the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." *Halverson*, 600 F.3d at 929; *see* 20 C.F.R. § 404.1520(a)(4).

On review of a Commissioner's decision denying Social Security benefits, a court examines whether the findings of the ALJ were "supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). When

assessing whether this standard is met, a court must consider all evidence, whether it supports or conflicts with the ALJ's findings. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). The ALJ's decision should not be reversed, however, merely because some evidence supports another outcome. *Id.* If it is possible to reach conflicting positions from the record, but one of those positions is that of the ALJ, the decision must be affirmed. *Id.*

## III. DISCUSSION

Plaintiff first faults the ALJ for disregarding certain opinions of her treating physicians. Second, she contends the ALJ should have regarded her fatigue, dizziness, blurred vision, anxiety, and depression as severe impairments. Third, she claims that her hearing impairment met or equaled Listing 2.08 and that her speech impairment met or equaled Listing 2.09, thereby rendering her disabled. Fourth, she argues that the ALJ erred in determining her RFC because he failed to incorporate the restrictions and limitations suggested by her doctors in 2006.

### A. The Opinions of Plaintiff's Treating Physicians

An ALJ must give controlling weight to the medical opinion of a treating physician if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the claimant's record. 20 C.F.R. § 404.1527(d)(2). In arguing that the ALJ erroneously disregarded her treating physicians' opinions, Plaintiff focuses on medical records dated after June 30, 2005, the date she was last insured. It is well-settled, however, that a claimant must prove she was disabled prior to the expiration of her insured status. *See, e.g., Stephens v. Shalala*, 46 F.3d 37, 39 (8th Cir. 1995). Here, the medical records from Plaintiff's treating physicians do not establish she was disabled before her insured status expired.

During the relevant time period between September 11, 2004 and June 30, 2005,

11

Dr. Delorey diagnosed Plaintiff with depression, anxiety, fatigue, muscle aches, and pains. However, none of Dr. Delorey's treatment notes during this timeframe suggest that these conditions were disabling. The only work restrictions Dr. Delorey placed on Plaintiff were temporary and due to a sprained ankle. Dr. Delorey's treatment notes from September 2004 through June 2005 are inconsistent with the work restrictions she later imposed in 2006.

According to Dr. Spahl's treatment notes during the relevant timeframe, Plaintiff's headaches were completely eliminated, and her jaw muscles were merely sore. This is consistent with Plaintiff's contemporaneous statement to Dr. Delorey that she was satisfied with Dr. Spahl's treatment of her TMJ syndrome. There is nothing in Dr. Spahl's treatment notes between September 2004 and the end of June 2005 that supports the work restrictions he later imposed.

In March 2005, Dr. Dixon noted that Plaintiff could work forty hours a week as long as she refrained from climbing ladders and strenuous pushing or pulling. Although Plaintiff reported an increase in neck and TMJ pain in June 2005, Dr. Dixon wrote that it was resolved two months later.

It is Plaintiff's burden to prove she was disabled at some point between September 11, 2004 and June 30, 2005, but the opinions and treatment notes of her treating physicians during this time period do not support a finding of disability. In assessing Plaintiff's impairments, the ALJ gave controlling weight to the opinions of her treating doctors during the relevant period of time. Unfortunately for Plaintiff, those opinions establish that she was not disabled by any impairment or combination of impairments between September 11, 2004 and June 30, 2005.

With respect to Plaintiff's argument that the ALJ should have given controlling weight to opinions rendered after the relevant time period, the ALJ was entitled to reject those opinions as

irrelevant, unsupported by clinical and laboratory findings, and inconsistent with other evidence. Dr. Delorey, Dr. Spahl, Dr. Dixon, and Dr. Hejny all opined in 2006, six months or more after Plaintiff's insured status expired, that Plaintiff was disabled. But none of the opinions specifically referred to the time period between September 2004 and the end of June 2005, which means they were not relevant to the time period under consideration. In addition, the opinions failed to incorporate clinical or laboratory findings, and indeed, there are no such tests in the record that would support the doctors' final opinions. Perhaps most importantly, the opinions are inconsistent with the doctors' own treatment notes, as well as other medical evidence from the relevant timeframe. The medical records pertaining to the period of time between September 2004 and the end of June 2005 simply cannot be reconciled with the doctors' functional limitations and restrictions. To the contrary, the relevant medical records demonstrate that Plaintiff was fully capable of working a forty-hour week, except for a short time after she sprained her ankle.

Although Plaintiff asserts that her condition remained unchanged after her date last insured, the Court does not agree. Plaintiff's medical records and subjective complaints reveal a significant deterioration in her condition six months to a year after the date she was last insured. For example, prior to June 2005, Plaintiff told Dr. Delorey that she was pleased she had finished college and loved student teaching, and Dr. Delorey had never placed long-term restrictions on Plaintiff's ability to work. A year later, Plaintiff reported she could not work longer than four or five hours a day due to pain, and Dr. Delorey placed significant restrictions on her ability to work. Similarly, prior to June 30, 2005, Dr. Spahl wrote that Plaintiff was doing "pretty good," had headache pain of only a two on a ten-point scale, and reported soreness in her jaw. By February 2006, however, Plaintiff described pain on both sides of her jaw, neck pain, and an

13

inability to hold up her head.

In sum, the Court concludes that the ALJ properly gave controlling weight to the opinions of Plaintiff's doctors as those opinions related to the period of time between the alleged onset of disability and the date last insured. The ALJ also properly discredited the opinions that were irrelevant to the time period under consideration, were not supported by clinical or laboratory findings, or were inconsistent with other substantial evidence.

### B. Plaintiff's Fatigue, Dizziness, Blurred Vision, Anxiety, and Depression

At step two of the sequential analysis, the ALJ rejected Plaintiff's complaints of fatigue, dizziness, blurred vision, anxiety, and depression as severe impairments. A severe impairment is one that "significantly limits" the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

There is very little medical evidence in the record supporting Plaintiff's claim that fatigue, dizziness, blurred vision, anxiety, and depression significantly limited her abilities to perform basic work activities during the relevant time period. Although Plaintiff was diagnosed with fatigue, depression, and anxiety, her doctors did not impose any work restrictions as a result of those impairments, and treatment notes do not support the imposition of such restrictions. In fact, Plaintiff's doctors remarked at least twice that she was capable of working forty hours a week. Symptoms of dizziness and blurred vision are mentioned only sporadically in the record, and there is no reason to believe the conditions would have had more than a minimal effect on her ability to work.

### C. Plaintiff's Hearing and Speech Impairments

Plaintiff submits that the ALJ should have found her disabled under Listing 2.08 for hearing loss or Listing 2.09 for loss of speech. When a claimant's impairment meets or equals an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is found disabled without regard to age, education, or work experience. 20 C.F.R. § 404.1520(d).

To qualify as hearing impaired under Listing 2.08, an individual's hearing must not be restorable by a hearing aid and must be manifested by:

> A. Average hearing threshold sensitivity for air conduction of 90 decibels or greater and for bone conduction to corresponding maximal levels, in the better ear, determined by the simple average of hearing threshold levels at 500, 1000 and 2000 hz. (see 2.00B1); or
>
> B. Speech discrimination scores of 40 percent or less in the better ear.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.08 (2005).

Plaintiff has not identified any test results satisfying Listing 2.08, and her occasional inability to hear the ALJ's remarks at the hearing does not establish that she meets or equals the requirements of Listing 2.08. Dr. Campanelli's testing, on the other hand, revealed hearing thresholds between 55 and 75 decibels and a speech discrimination score of 96 percent, which clearly fall outside the parameters of the listing.

To meet or equal Listing 2.09, a claimant must demonstrate a loss of speech "with inability to produce by any means speech that can be heard, understood, or sustained." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.09 (2005). There is no evidence in the record that Plaintiff is unable to be heard, understood, or sustain speech by any means. Plaintiff's doctors never remarked that Plaintiff had difficulty speaking with them, nor did they ever recommend that she use a mechanical or artificial device to improve her speech.

### D. Plaintiff's RFC

After the ALJ found that Plaintiff's impairments did not meet or equal a listed impairment, he assessed her RFC in order to determine what she could do despite her limitations. *See* 20 C.F.R. § 404.1545(a)(1). Plaintiff contends that the ALJ should have adopted the opinions

of her treating physicians that she would not be able to sustain full-time employment. However, as previously discussed, those opinions did not relate to the time period between the alleged onset of disability date and the date last insured, and the ALJ therefore properly disregarded that evidence. The ALJ's determination that Plaintiff could perform unskilled work at all exertional levels, as long as she was not exposed to constant, concentrated noise, and was not required to speak more than occasionally, during the time period of September 11, 2004 through June 30, 2005, was supported by substantial evidence in the record.

## IV. RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 7) be **DENIED**;

2. Defendant's Motion for Summary Judgment (Doc. No. 9) be **GRANTED**; and

3. **JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: September 30, 2010

                                         s/ *Jeanne J. Graham*
                                         JEANNE J. GRAHAM
                                         United States Magistrate Judge


### NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **October 18, 2010**. A party may respond to the objections within ten days after service thereof. Any objections or

responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made.